FILED
2014 Jun-04  PM 03:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DIVISION OF ALABAMA
SOUTHERN DIVISION

TERRI L. CHANDLER,          )
                       )
      Plaintiff,       )
                       )
v.                    )     Case No. 2:12-cv-2870-TMP
                       )
INFINITY INSURANCE GROUP,   )
                       )
      Defendant.      )

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment (doc. 25) filed October 24, 2013, by the defendant, Infinity Insurance Group ("Infinity"). Defendant seeks dismissal of plaintiff's claims of religious discrimination and retaliation brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiff, Terri L. Chandler, is a Jehovah's Witness.   Her complaint alleges that she was discriminated against on account of her religion because her employer, Infinity, forced her to attend a Christmas party, which violated her religious beliefs. (Count I).[1]   She

---

[1]    The defendant apparently reads the complaint more broadly, construing

further alleges that she was later disciplined and fired in retaliation for her refusal to participate fully in the Christmas party events.   (Count II).   The motion for summary judgment was supported by a brief and evidentiary submissions.   (Docs. 26, 27).   Plaintiff filed an opposition in response, supported by a copy of her EEOC charge. (Doc. 29).   Defendant filed a brief in reply.   (Doc. 30).

## SUMMARY JUDGMENT STANDARDS

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."   Celotex

---

Count I to include claims that the disciplinary actions and termination that came in the months following the party also were discriminatorily based on her religion.   That broad reading of the complaint, however, is unwarranted.   Plaintiff specifies that the conduct that was discriminatory was the forced attendance at a holiday party.   She further has specified, in both her EEOC charge and her complaint, that after she refused to participate at the party, she was retaliated against by being reprimanded and ultimately fired.

Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).   The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23.   There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."   Id. at 323.

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.   Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.   "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   Id. at 249.   His guide is the same standard necessary to direct a verdict:   "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).   However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).   If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.   Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).   Furthermore, the court must "view the evidence presented through the prism of the substantive

evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.   <u>Anderson</u>, 477 U.S. at 254; <u>Cottle v. Storer Communication, Inc.</u>, 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.   <u>Anderson</u>, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## <u>FACTS</u>

For purposes of determining the defendant's motion for summary judgment, the following facts are undisputed, or if disputed, are taken in a light favorable to the non-moving plaintiff:

Infinity is a property and casualty insurance company that provides automobile insurance.   Infinity employs electronic funds transfer clerks ("EFT clerks") who work in the accounting department.   They are responsible for setting up and maintaining the accounts for payment of insurance premiums.   Because EFT clerks handle customers'

bank account information, attention to detail and accuracy of work is very important. EFT errors may negatively affect customers' bank accounts, causing disgruntled customers and additional costs to Infinity.

At all relevant times, Infinity had an Equal Employment Opportunity Policy, which strictly prohibits any form of discrimination in all terms and conditions of employment, including discrimination based on religion.   The policy also prohibits retaliation against an employee who reports discrimination.   The policy is published in the employee handbook, which is distributed to employees upon hire and as updates are made.   The policy requires an employee who believes he or she has witnessed or been subject to discrimination or retaliation to immediately report it to Human Resources. The handbook also contains an Employee Conduct Policy, which contains examples of conduct Infinity considers inappropriate and that will subject employees involved to disciplinary action up to and including termination.

The plaintiff, Terri L. Chandler, was hired as a part-time mail clerk in August 1992.   She began working full-time at Infinity in 1993.   She received a copy of the handbook and updates issued during her employment.   She understood that Infinity prohibited religious discrimination and retaliation and that she was required to report any concerns about discrimination and retaliation to Human Resources.   Chandler also

understood that the following conduct was violative of Infinity's Employee Conduct Policy, and would subject her to disciplinary action that could include termination: inattention to duties; excessive use of company time, property, or materials for personal reasons; failure to notify a supervisor of an absence from work within one hour of her scheduled shift; and excessive inefficiency, substandard production, waste, or defective work.

During her employment at Infinity, Chandler held several positions in the accounting department.   In March 2008, she was hired as an EFT clerk.   Staci Elder, Cash Receipt Supervisor, interviewed her for that position and made the decision to hire her.   Elder knew that Chandler was a Jehovah's Witness.   Chandler understood that attention to detail was important to her job as an EFT clerk.   As an EFT clerk, she reported to Elder and General Accounting Supervisor Helen Crenshaw.

Plaintiff received several disciplinary notices during her employment at Infinity. On February 23, 2007, (before she began working as an EFT clerk) plaintiff was issued a written warning and placed on probation for 90 days for excessive inefficiency after she made excessive errors following her 2006 performance evaluation.   She was cited for making duplicate payments to vendors and failing to research all issues to ensure that her processing was accurate.   On May 13, 2008, (after she became an EFT clerk) plaintiff was issued a counseling report for inattention to duties after she updated a

customer's EFT information with information from another customer's bank account.[2]
Chandler committed at least one other EFT error in 2008 for which she was corrected
by a supervisor in the normal course of business.[3]   On September 21, 2009, plaintiff
was issued a written warning and placed on probation for 90 days after she failed to
notify her supervisor of an absence from work within one hour of her scheduled start
time.   Chandler, however, had been told by Elder that it was unnecessary to call in
every day.   Plaintiff committed at least nine EFT errors between February and early
June 2010 for which she was corrected by a supervisor in the normal course of business.
On June 21, 2010, plaintiff was issued another Counseling Report for inattention to
duties after she processed four customer policies in error.   Plaintiff disagreed with the
Counseling Report because it was her first time processing "e-check re-sweeps" and she
was distracted when one of her co-workers came to assist her.   She admits that she
received training on how to process "e-check re-sweeps" prior to making the errors, and

---

[2]     The facts set forth preceding this footnote are taken from the defendant's
brief and/or plaintiff's deposition, and have not been disputed by the plaintiff.   The
facts following this footnote exclude the information from defendant's brief that the
plaintiff has identified as disputed, and include both additional facts provided by
plaintiff or gleaned from the exhibits.

[3]     In its statement of facts, the defendant states that the plaintiff made errors
for which she was "counseled by Elder."   The plaintiff has disputed this description,
asserting that the "defendant is misrepresenting what was a correction by a supervisor in
the normal course of business as 'counseling.'" The plaintiff has not disputed that the
errors alleged were made, or that a supervisor addressed the error.

concedes that she does not know of any co-worker who re-swept four policies in error and was not issued written discipline.   On July 30, 2010, plaintiff was issued an Informal Discipline for failure to follow Infinity's mailing procedures, which resulted in customers not receiving notification of cancelled policies in a timely manner.   Plaintiff committed at least four EFT errors between August 2010 and early January 2011 for which she was corrected by a supervisor in the normal course of business.   On January 24, 2011, plaintiff was issued a written warning and placed on probation for 90 days for improper, unauthorized and excessive use of Infinity property after she made more than fourteen and a half hours of telephone calls during work hours in December 2010, even though she worked only 16 days that month.   Plaintiff, however, had reasons she asserts were acceptable under the company policy for using the telephone for that amount of time.   Plaintiff understood that any further performance issue or company-policy violation would result in termination.   During the 90-day probation, plaintiff committed at least one EFT error.   Although immediate termination was warranted, Elder only counseled plaintiff regarding the error.   On June 13, 2011, plaintiff exhibited excessive inefficiency, substandard production, waste or defective work when she duplicated a debit to a customer's bank account, causing the customer to be charged twice for an insurance premium.   Elder recommended that plaintiff be terminated, and Crenshaw approved the termination.

Plaintiff's employment was terminated on June 23, 2011.   Infinity has stated that the reason for the termination was repeated deficiencies in the accuracy of her work. At no time did anyone from Infinity tell plaintiff that she was being terminated because of her religion.   Plaintiff has identified Ann Reed and Cerethia Tyson as employees who were not Jehovah's Witnesses, but had the same types of performance issues and were not terminated.   Ann Reed's December 2010 telephone report shows fewer hours of calls than plaintiff's report, and Reed explained to Elder that the majority of her calls were business related, not personal.   There has been no evidence at all produced to show Tyson's disciplinary record, nor does plaintiff detail what she believes Tyson did for which she was not disciplined.

Elder and Crenshaw have terminated employees who were not of the same religion as Chandler for repeated deficiencies in the accuracy of their work.   Elder knew when she hired Chandler that she was a Jehovah's Witness, and she never said anything inappropriate or derogatory about Chandler's religion.

As a Jehovah's Witness, plaintiff does not celebrate birthdays or civil, patriotic, or religious holidays, or anything that has a pagan origin.   She may attend social functions that are not associated with religious, political, or patriotic observances, such as baby showers, anniversaries, charity events, and employee appreciation events.

Plaintiff does not allege that any discriminatory conduct occurred prior to November 2010.   She alleges that, in November 2010, despite knowledge of plaintiff's Jehovah Witness religion, Elder forced her to attend a company holiday party at Infinity's Colonnade location, telling her that the party was mandatory and that she expected her to attend.   Plaintiff did not tell Elder that she could not attend the function because of her religion,[4] and no one at Infinity forced her to eat, drink, or otherwise participate in any activities at the party.   Plaintiff called the party a Christmas

---

[4]      Plaintiff's testimony about this conversation can be found in her deposition at pages 123-128.   Part of that testimony is the following:

Q: …. But my question is: In this instance where Staci told you there was a party that was mandatory that you had to attend, did you tell her that you could not go because of your religion?

A:  I didn't tell her I could not go.   I just --- what I said was, well, Staci, I said I'd go, but I won't --- I said I'm not going to participate and I'm not going to eat anything.

Q:  Anything else?

A:  No.

Q:  What did she say in response to that?

A:  She said that, you know, I would have to drive my own car, you know.   So I didn't say anything else, I just got up and I walked out.

Plaintiff's Depo. pp. 127-128, Doc. 27-1, p. 33 of 53.

party in her complaint, but admits that she does not recall any holiday decorations, music, or other holiday celebration that took place at the function.   She recalls pie-throwing.[5]

Plaintiff attended the event, but did not eat or drink at the party.   She brought a drink with her to have at the party so that she would not be accepting any food or drink, or be "participating" in the event.   Elder stared at her during the party and appeared upset that plaintiff did not participate in the festivities.   Plaintiff did not tell anyone at Infinity that her refusal to participate was based upon her religion.[6]   No one at Infinity said anything derogatory to her about her failure to participate, but after the party, Chandler believes that Elder treated her differently.

---

[5]      Infinity has presented evidence that it held its only 2010 company Christmas party on December 17, 2010, at Cahaba Grand Conference Center, and not at the Colonnade.   The only company function that involved a pie-throwing event and was attended by both plaintiff and Elder was at the Colonnade in November 2009 (not 2010), according to Infinity, and was part of the company's employee appreciation week.   The pie-throwing event was a charity fundraiser.   While Infinity clearly disputes that the party described in the complaint was held in 2010, or that plaintiff attended a company holiday party in 2010, the court views the facts in the light most favorable to the plaintiff and, thus, considers as a fact that a Christmas party was held in 2010 and that plaintiff attended, having been told that attendance was mandatory.

[6]      There is testimony that plaintiff complained to Helen Crenshaw about disrespectful emails to her from Elder, but plaintiff testified that she never complained to Crenshaw about the holiday party or her religious objections to it.   See Pl.'s Depo., at 112-113.   She never indicated to Crenshaw that Elder's treatment was due to her religion.   Id.

Plaintiff contends that Elder treated EFT clerk Cynthia Ford more favorably in terms of vacation usage, but plaintiff admits that she always was allowed to choose her vacation days before Ford, and that she was never denied the vacation time she selected. In 2011, plaintiff was terminated before using the vacation days she had selected. After plaintiff was terminated, Ford took vacation on the days that had been selected by plaintiff.

Plaintiff alleges that Elder treated non-EFT clerks Angela Gooden and Tekia (last name unknown) more favorably with regards to disciplinary actions for EFT errors, but she admits that Gooden and Tekia were cross-training in EFT when they made the errors. Plaintiff also admits that Elder did not issue a written disciplinary notice to her every time she had made an EFT error.

Plaintiff did not speak to anyone in Human Resources about the treatment she was receiving from Elder. Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission on November 18, 2011. She filed the complaint that commenced this lawsuit on September 4, 2012.

## DISCUSSION

Defendant seeks summary adjudication of plaintiff's claims of religious discrimination and retaliatory discharge in violation of Title VII. Defendant asserts

that Plaintiff is unable to offer evidence to meet the elements required to prove a *prima facie* case of discrimination or retaliation under Title VII.  Defendant further asserts that it has offered a legitimate, non-discriminatory reason for the discipline given to the plaintiff and for her termination, and that plaintiff has not shown that reason to be pretextual.

### A.   Religious Discrimination

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, **religion**, sex, or national origin." 42 U.S.C.A. § 2000e−2(a)(1)(emphasis added).  In any Title VII case, proof of a discriminatory motive is "critical."  International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).  A disparate treatment claim requires proof of discriminatory intent, either through the use of direct or circumstantial evidence.  See, e.g., Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  In order to establish a *prima facie* case of discrimination, a plaintiff may present to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role in the employment decision,"  Eskra v. Provident Life and Accident Ins. Co., 125 F.3d 1406, 1411 (11th

Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination.[7] <u>Zaben</u>, 129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions. <u>Carter v. City of Miami</u>, 870 F.2d 578, 580-81 (11th Cir. 1989). Direct evidence is limited to "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor. <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002), quoting <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir.1999); <u>see also</u> <u>Carter</u>, 870 F.2d at 582 (11th Cir.1989).

Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence in accordance with <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). When the plaintiff relies upon circumstantial evidence, rather than direct evidence, she creates a presumption of discrimination by establishing a *prima facie* case. The presumption may be rebutted,

---

[7] Plaintiff has not offered any statistical evidence or attempted to prove her claim by a statistical pattern of religious discrimination.

however, if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the preferred reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g _en banc_ denied, 172 F.2d 884 (11th Cir. 1999), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

It is not the duty of this court to evaluate whether the employment decisions made were fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Questionable business judgment is not evidence of discrimination.  See id.  Moreover, courts have recognized that the discrimination laws should not be used to override employment decisions "based on individual assessments of a person's abilities, capabilities, or potential."  Magruder v. Selling Area Mktg. Inc., 439 F. Supp. 1155 (N.D. Ill. 1977).

Plaintiff has not defined the form of religious discrimination that she is alleging. Courts have recognized that a plaintiff may be subjected to a hostile working environment on account of religion, or may be subjected to disparate treatment because

of religion, or may be discriminated against when an employer fails to reasonably accommodate a requirement of his or her religion.   See, *e.g.*, Tillery v. ATSI, Inc., 242 F. Supp. 2d 1051 (N.D. Ala. 2003).    While the complaint does "re-allege and incorporate by reference" the factual statements made in paragraphs 8-13 of the complaint, the only fact set forth in Count I of the complaint alleging "religious discrimination" is that she was "forced ... to attend an after work religious based party that was against [her] religious beliefs."   Because there is no reference to any severe or pervasive hostile working environment or any severe or pervasive harassment of any kind – in either the complaint or the EEOC charge – the claim cannot be construed as one alleging that Infinity created or allowed to exist a hostile working environment.   See, *e.g.*, Blanton v. Bunch and Assoc., Inc., 2006 WL 269981 *8, n.9 (M.D. Fla. Feb. 3, 2006)(holding that failure to plead a hostile work environment claim in the complaint precludes arguing that theory in response to a dispositive motion).

Because plaintiff specifically alleges that she was "forced" to attend a party, while others were not forced to attend (attachment to EEOC charge, doc. 29-1, p. 2), the claim could be viewed as one of disparate treatment.[8]   A review of other cases

---

[8]    The plaintiff says she was required to attend because Elder told her that attendance was mandatory.   In her EEOC charge, she refers to the party as "mandatory."   At deposition, however, she testified that she was told that it was mandatory, when in fact it was not.   The only evidentiary basis for her conclusion that attendance was not mandatory, was her observation that some of her coworkers did not

involving discrimination based on religion, however, suggests that the case is best analyzed as one in which the plaintiff required some accommodation for her religious beliefs.   Plaintiff has offered no comparator evidence to show that she was singled out and forced to attend the party while other employees of different religions were not, nor is there any evidence that she was forced to attend *because* of her religion.

Plaintiff complains that one event in her 17-year history at Infinity was offensive to her religion, and she essentially argues that, as an accommodation of her religious beliefs forbidding observance of Christmas, Infinity either should have given plaintiff permission to forgo attending the party, or should have held the mandatory party with some other "theme" that was not offensive to her religion.[9]   Plaintiff's claim is best analyzed as a failure to accommodate claim.

In order to survive a properly supported motion for summary judgment, the plaintiff in a Title VII religion discrimination case must establish a *prima facie* case by showing that: (1) she had a *bona fide* religious practice that conflicted with an

---

attend.   Absent some evidence that other workers were told the party was not mandatory and that the purpose in "forcing" her to attend was discriminatory, however, she has failed to demonstrate actionable disparate treatment.   There is no evidence that plaintiff was forced to attend *because* of her religion.

[9]      The defendant asserts that the party plaintiff references was not a holiday party, but was an employee appreciation event, and that there was not a Christmas or holiday theme for the party.   Plaintiff admits she does not recall holiday decorations or music, but insists it was a holiday party.

employment requirement,[10] (2) she brought the practice to the employer's attention, and (3) the religious practice was the basis for an adverse employment decision.   Beadle v. Hillsborough County Sheriff's Dep't, 29 F.3d 589, 592 n.5 (11th Cir. 1994); see also Equal Employment Opportunity Comm'n v. United Parcel Serv., 94 F.3d 314, 317 (7th Cir. 1996); Equal Employment Opportunity Comm'n v. Union Independiente de la Autoridad de Acuedoctos & Alcantarillados de Puerto Rico, 279 F.3d 49 (1st Cir. 2002); Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir. 2000).[11]   A plaintiff alleging employment discrimination on account of religion must "present evidence, either direct or circumstantial, sufficient to allow a reasonable fact finder to conclude that the defendant intentionally and unlawfully discriminated against the plaintiff, *i.e.*, in a religious discrimination case, that the employment decision at issue was made 'on account of [the plaintiff's] religious *beliefs*.'" Perdue v. C. Hager & Sons Hinge Mfg. Co., Inc., 412 F. Supp. 2d 1227 (M.D. Ala. 2005), quoting Young v. Southwestern Sav. & Loan, 509 F.2d 140, 143 (5th Cir.1975) (emphasis added).   It is not enough for the

---

[10]     There is no contention by defendant that plaintiff did not have a *bona fide* religious practice which forbade participation in a Christmas party, or that she sincerely held that religious belief.   The second and third elements of the *prima facie* case are the ones at issue here.

[11]     The religious belief must be "sincerely held," and not just a personal preference; however, there is no requirement that the belief be "acceptable, logical, consistent or comprehensible to others."   Thomas v. Review Bd. Of Ind. Employment Sec. Div., 450 U.S. 707, 714, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981).

plaintiff merely to show that her employer knew of her religious beliefs; there must also be evidence to support an inference that the religious practices were the basis of the adverse employment action.   Perdue, 412 F. Supp. 2d at 1236 n.13.

Religious discrimination cases differ from other Title VII cases in that the plaintiff must show that the employer was made aware of the religious practice at issue, and was given an opportunity to accommodate it.   EEOC v. United Parcel Serv., 94 F.3d at 318 n.3.   The second element of a *prima facie* case of religious discrimination is met only where the plaintiff has "informed [the employer] of the existence of [the religious] belief and its conflict with the requirement."   Telfair v. Federal Express Corp. 934 F. Supp. 2d 1368, 1383 (S.D. Fla. 2013) (Jehovah's Witness told employer that Saturday Bible studies were a necessary expression of that faith and that working on Saturdays conflicted with the belief); Beadle, 29 F.3d at 591 (finding as a requirement of the *prima facie* case that the Seventh Day Adventist plaintiff had informed the employer that working on Saturdays violated his religious beliefs).   The need for accommodation is similar to cases arising under the Americans with Disabilities Act, in which the employee must participate in good faith dialogue, making efforts to communicate with the employer about what religious accommodations may be necessary.   See, *e.g.*, Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130 (7th Cir. 1996).   The necessity of an accommodation does not arise, of course, unless the employee first has informed

the employer of the belief and the need for an accommodation.   See, e.g., Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317 (11th Cir. 2007).

Other circuit courts of appeals have addressed the interactive nature of the need for a religious accommodation.   In Wilkerson v. New Media Tech. Charter School, Inc., the court held that and employee must give "'fair warning' that a particular employment practice will interfere with that employee's religious beliefs." 522 F.3d 315 (3d Cir. 2008), quoting Reed v. Great Lakes Cos., 330 F.3d 931, 935 (7th Cir. 2003). Placing such a burden on the employee is sensible because an employer is not "charge[d] with detailed knowledge" about the particularized beliefs and observances of various religious sects.   330 F.3d at 936.   Only when an employee has informed her employer of a conflict between the requirements of her employment and her religious beliefs, and the employer refuses to accommodate her religious beliefs, can it be said that the employee's religious beliefs were the basis of the employer's adverse employment action.

The Tenth Circuit Court of Appeals has addressed the requirement that the employee initiate the discussion regarding the need for an accommodation in a case involving a woman who wore a headscarf as part of her Muslim religion:

> In sum, we hold that, in order to establish the second element of their prima facie case under Title VII's religion-accommodation theory, ordinarily plaintiffs must establish that they initially informed the

employer that they engage in a particular practice for religious reasons and that they need an accommodation for the practice, due to a conflict between the practice and the employer's work rules.  As noted, we recognize that some courts have taken a different path on this question. However, we are confident that our approach is the sounder one.

 ....

 Given Title VII's conception of religion and the interactive nature of the religion-accommodation process, we are hard-pressed to see how we could logically reach another conclusion regarding the notice element of the prima facie case.  This is because the answers to the key questions that determine whether an employer has an obligation under Title VII to provide a reasonable religious accommodation ordinarily are only within the ken of the applicant or employee; because an employer's obligation to engage in the interactive religion-accommodation process is only triggered when the employer has answers to those questions; and because, in implementing Title VII's anti-discrimination mandate, the EEOC has expressly disapproved of employers inquiring in the first instance or speculating about the answers to such questions.

 For example, recall that Title VII only obliges employers to provide a reasonable accommodation for practices that applicants or employees engage in because of bona fide, sincerely held religious beliefs.  *See, e.g., EEOC Q & A, supra* ("Title VII requires employers to accommodate only those religious beliefs that are religious and sincerely held...." (internal quotation marks omitted)).  As noted, those beliefs are defined broadly, but "typically concern [ ] ultimate ideas about life, purpose, and death." EEOC Compliance Manual § 12–I(A)(1) (internal quotation marks omitted).  Title VII does not extend its protections to practices that are engaged in as a matter of personal preference or for cultural reasons, *see, e.g., Reed*, 330 F.3d at 935 ("[A]n employee is not permitted to redefine a purely personal preference or aversion as a religious belief."), and no matter how strongly an applicant or employee believes in certain political, economic, or social ideas, if those ideas do not otherwise relate to the stuff of religion (e.g., ultimate notions about life, purpose, or death), then

practices based upon them do not fall within Title VII's protective ambit, see, e.g., EEOC Compliance Manual § 12–I(A)(1).

But how is an employer to know that applicants or employees are engaged in a practice for religious reasons, unless they inform the employer? *Cf. id.* ("Determining whether a practice is religious turns not on the nature of the activity, but on the employee's motivation. The same practice might be engaged in by one person for religious reasons and by another person for purely secular reasons."). To be sure, in certain instances, applicants or employees may engage in practices that are traditionally associated with a particular religion. However, Title VII does not require employers to become knowledgeable about the customs and observances of religions. *See, e.g., Wilkerson*, 522 F.3d at 319 ("[W]e do not impute to the employer the duty to possess knowledge of particularized beliefs of religious sects."); *Reed*, 330 F.3d at 936 (noting that "employers are not charged with detailed knowledge of the beliefs and observances associated with particular sects"); EEOC Compliance Manual § 12–IV(A)(1) (noting that an employee "cannot assume that the employer will already know or understand" "the religious nature of the belief or practice at issue").

Furthermore, even if an employer was generally aware of the beliefs and observances that are traditionally associated with a particular religious group, and also knew that the applicant or employee displayed symbols associated with that group—or even that the applicant or employee specifically claimed to be a member of that group—ordinarily, the employer would still not know whether the conflicting practice in question actually stemmed from religious beliefs unless the particular applicant or employee informed the employer, because under Title VII, as we have discussed, religion is a uniquely personal and individual matter. *See, e.g.,* EEOC Compliance Manual § 12–I(A)(1) ("An employee's belief or practice can be 'religious' under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few—or no—other people adhere to it." (emphasis added)); see also id. ("[A] person's religious beliefs need not be confined in either source or content to traditional or parochial concepts of religion. A belief is religious for Title VII purposes if it is religious in the person's own scheme of things...." (emphasis added) (footnotes omitted) (internal

quotation marks omitted)).   In holding that Title VII places a "duty on the employee to give fair warning of the employment practices that will interfere with his religion," *Reed*, 330 F.3d at 935, the Seventh Circuit succinctly and cogently touched on a like point.   Specifically, the court in *Reed* stated: "A person's religion is not like his sex or race—something obvious at a glance.   Even if he wears a religious symbol, such as a cross or a yarmulka, this may not pinpoint his particular beliefs and observances...." *Id.* at 935–36 (emphasis added).

Similarly, in upholding the dismissal of the plaintiff's religion-accommodation claim because she failed to inform her employer of her need for an accommodation due to a conflict between her Christian beliefs and the employer's "libation" or alcohol-drinking ceremony, the Third Circuit in *Wilkerson* rejected the plaintiff's suggestion that the employer's knowledge that she was a Christian was enough to trigger its accommodation obligation.   Specifically, the Third Circuit stated, "that [the employer] knew she was a Christian does not sufficiently satisfy [the plaintiff's] duty to provide 'fair warning' to [the employer] that she possessed a religious belief that specifically prevented her from participating in the libations ceremony." *Wilkerson*, 522 F.3d at 319 (emphasis added).   Indeed, the Third Circuit went further and concluded that even if the employer "suspected" that the libations ceremony would be specifically offensive to the plaintiff, that would not relieve the plaintiff of the obligation to "inform the defendants that the libation ceremony would offend her religious beliefs." Id. at 319–20 (emphasis added).   In the same vein, in upholding the denial of the plaintiff's religion-accommodation claim, the Fourth Circuit rejected the plaintiff's argument that the employer's knowledge of the plaintiff's strongly held religious beliefs was enough to "put it on notice" that those beliefs would— in the plaintiff's view—oblige her to "write, and send, personal, accusatory letters to co-workers at their homes." *Chalmers*, 101 F.3d at 1020 n. 3.   Therefore, even if an employer were on notice that an applicant or employee subscribed to a particular religious belief system, because religion under Title VII is a uniquely personal matter, that information would not be enough to tell the employer what practices are religious in "the person's own scheme of things." EEOC Compliance Manual § 12–I(A)(1) (internal quotation marks omitted).   Ordinarily, the

only way the employer would know such information is if the applicant or employee informed the employer.

Knowing this much demonstrates why the most natural reading of Title VII's religion-accommodation provision is one that ordinarily places the burden on the applicant or employee to inform the employer of the conflicting religious practice and the need for an accommodation, and why a contrary reading of the statute would be patently unfair to employers. Reed provides a hypothetical that powerfully underscores this point:

Equal Employment Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc., 731 F.3d 1106, 1131-33 (10th Cir. 2013).  The Tenth Circuit summarized its holding, noting that "even if an employer has particularized, actual knowledge of the religious nature of the practice − that is knowledge that the practice of a particular applicant or employee stems from his or her religious beliefs − that still would not be sufficient information to trigger the employer's duty to offer a reasonable accommodation."  731 F.3d at 1133.

Chandler has not alleged that she ever informed Elder, or anyone at Infinity, that attending a holiday party would conflict with her sincerely held religious beliefs. Infinity has offered the affidavit of Elder, who stated that Chandler made her "aware that she was a Jehovah's Witness during her interview," and further that Elder is "familiar with this religion, as [she] has family members who are Jehovah's Witnesses." (Doc. 27-4, Affi. of Elder, ¶ 12).   Even this specific knowledge, however, is

25

insufficient to trigger Infinity's duty to offer a reasonable accommodation because Chandler never told anyone, even her supervisor Elder, that attending a holiday party gave rise to a need for a religious accommodation, or, as the Tenth Circuit Court of Appeals phrased it, that she felt "obliged by religion" to adhere to the practice of avoiding holiday celebrations of any kind.  Even though Elder was knowledgeable about the Jehovah's Witness religion, neither she nor Infinity was not charged with understanding all of the practices of the religion, much less whether Ms. Chandler personally felt obliged to adhere to any particular practice of the religion.  A contrary result would place an employer in the untenable position of having to inquire into the existence and parameters of the religions observed by its employees, and having to accommodate employees, even when the employees may not adhere to any particular tenets of a religion.

Chandler's claim that Title VII was violated when Elder told her that it was mandatory that she attend and participate in a company Christmas party is due to be dismissed because Chandler has failed to prove a *prima facie* case of religious discrimination.  She has not demonstrated that she gave her employer "fair warning" that attending the party would violate her sincerely held religious beliefs and that she was in need of an accommodation.  She did not engage in the interactive process necessary to set the right to an accommodation in motion.  Infinity had no obligation

to inquire about Chandler's religious beliefs and which practices of the faith she followed or held closely.   To the contrary, Infinity would have subjected itself to other claims of discrimination had it taken the initiative to investigate the religious practices of its employees.

Chandler's claim also is subject to summary disposition in favor of Infinity because she has failed to meet the third element of a Title VII *prima facie* case: she has not shown that the religious practice was the basis for an adverse employment decision. Chandler has not come forward with any evidence that her employer had any intent to discriminate, or any animosity toward her religion.   The supervisor whom she alleges exhibited the animus, Elder, is the same supervisor who hired her for the position, fully aware that she was a Jehovah's Witness.   Chandler admits there were never any derogatory comments made about her religion during the 17 years she worked there. There is simply no evidence that any action taken by Infinity was on account of the plaintiff's religious beliefs.[12]   For all of these reasons, Infinity's motion for summary

---

[12]      Even if the court were to construe the complaint to include, as disparate treatment claims, her allegations that her discipline was meted out discriminatorily, there still is no evidence to support the conclusion that the discipline was imposed on account of her religion.   If Elder singled out Chandler for discipline because she simply did not like her personally, that treatment is not violative of Title VII.   Absent some evidence of discriminatory intent based on religion, the claim for disparate treatment must fail.

judgment on the Title VII religious discrimination claim is due to be granted, and Count I of the complaint is due to be dismissed.

## B.   Retaliation

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove each of the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision.  Goldsmith v. Bagby Elevator Co, Inc., 513 F.3d 1261, 1277 (11th Cir. 2008), citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2410-16, 165 L. Ed. 2d 345 (2006).   In addition, the plaintiff must show that her employer was aware of her participation in the protected activity when it took the adverse action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999).   As explained below, this claim also must be dismissed.

### 1.   Protected Activity

There is no dispute that Chandler suffered an adverse action in the form of various disciplinary notices meted out to her after the November 2010 party, but defendant argues that she did not engage in any statutorily protected activity and that, even if she did, there is no causal relation between her refusal to participate at the party

and the disciplinary actions and termination.   Thus, in dispute are the first and third

elements of the *prima facie* requirement.

An employee's generalized complaint about bad treatment in the workplace is

not sufficient to meet the requirement that the plaintiff engaged in protected activity.

The Eleventh Circuit Court of Appeals has noted:

> We affirm the district court's judgment because, as the court
> correctly noted, the record contained no evidence that Brown engaged in a
> protected activity by making a complaint about racial discrimination or
> harassment.   Brown admitted that she never mentioned the word "race"
> when she complained about Kirby's behavior, that she had no knowledge
> of Kirby making any racially derogatory comments, and that Kirby took
> out her anger on everyone, including the white office assistant.
> Moreover, Brown did not engage in a protected activity because she never
> voiced a complaint that the City was engaged in an unlawful employment
> practice.

Brown v. City of Opelika, 211 Fed. Appx. 862 (11th Cir. 2006).   Engaging in a

"protected activity" involves opposing an employment practice that the employee

reasonably believes is illegal under Title VII.   The "opposition" must be made know to

the employer in the form of a complaint or some overt rejection of what the employee

believes to be an illegally discriminatory practice or decision.   Remaining silent in the

face of an illegal practice is not engaging in a "protected activity."   An employer may be

guilty of retaliation only with respect to things it knows about.

Chandler has failed to present any evidence that she engaged in any protected activity until after she was fired, when she filed a charge with the EECO.   She made no internal complaint to Infinity that she had ever been treated differently because of her religion while she was working at Infinity.   While she complained to Crenshaw about "disrespectful" emails from Elder, she never told Crenshaw that this was due to her religion. (See Pl.'s Depo., at 112-113, Doc. 27-1, pp. 29-30 of 53).   At the time that Infinity held the party complained of, she did not tell anyone that it was offensive to her religion.   Her only "opposition" to the party was that she brought her own drink and did not eat, drink or otherwise participate.   The plaintiff's only suggestion, in her brief, that she engaged in a protected activity is to cite Crawford v. Metropolitan Gov't of Nashville, 555 U.S. 271, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009) for the proposition that "standing pat" can constitute opposition.   (Doc. 20, p. 11).   Crawford is inapposite to this case.

The Supreme Court in Crawford examined the "opposition clause" of Section 2000e-3(a), which prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by the Civil Rights Act, or who has "made a charge, testified, assisted, or participated" in any proceeding relating to an unlawful employment practice.   42 U.S.C. 2000e-3(a).   The plaintiff in Crawford had described instances of sexual harassment when she was asked, during an internal

30

investigation that arose from rumors about sexual harassment by a school district's employee relations director, whether she had witnessed any inappropriate behavior by the director. She described several instances in which the director had made inappropriate sexual remarks or gestures.    Crawford was later accused of embezzlement and was fired.

The district court granted summary judgment against the plaintiff in <u>Crawford</u> on her claims of retaliation, concluding that she had not satisfied the opposition clause because she had not "instigated or initiated any complaint" about gender discrimination, but had merely answered questions asked of her in an investigation initiated at the behest of another employee.  The appellate court affirmed, holding that opposition required "active, consistent" activities.  The Supreme Court reversed and remanded, however, holding that Crawford's "disapproving account" of the sexual behavior, which "antagonized" her employer, was sufficiently "resistant" and "antagonistic" to constitute "opposition."    555 U.S. at 275-76.    The Court noted: "'When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" 555 U.S. at 276.

The Eleventh Circuit Court of Appeals has limited the application of <u>Crawford</u>, noting that the case "pertained only to whether the reporting of a harassment claim was

covered by Title VII where the reporting was solicited rather than volunteered."   Brush v. Sears Holdings Corp., 466 Fed. Appx. 781, 787 (11th Cir. 2012).   The caution with which the holding in Crawford must be applied is justified. The plaintiff in Crawford was questioned directly about allegations of sexual harassment.   Her answers plainly described conduct that had violated Title VII.   In the instant case, by comparison, no employee ever made allegations, while Chandler was employed there, that any Infinity supervisor engaged in religious discrimination.   Chandler's only "opposition" was to attend a party without enjoying herself; she did not complain to any supervisor or Human Resources officer about having to attend the party.   Nothing about her "standing pat" at the party plainly indicated that she was opposing religious discrimination taking place.   Her conduct could reasonably have been understood as shyness, social awkwardness, a dislike of coworkers or supervisors, or simply not being in the mood to party.   In this case, Chandler's actions in refusing to "participate" cannot be regarded as opposition to religious discrimination.   Her conduct did not signal to Infinity that she believed it was engaged in prohibited religious discrimination. Chandler may suspect that Elder knew that she was not eating or drinking because of religious beliefs and that attending the party violated her religious beliefs, but there is no evidence that supports this hunch.   The fact that Elder was "familiar" with Jehovah's

Witnesses does not lead to the conclusion that she understood all of the tenets of the religion, much less which ones Chandler held as sincere beliefs and followed.[13]

Accordingly, there is no evidence that Chandler engaged in a statutorily protected activity before she was disciplined or fired.  For this reason, Infinity is entitled to summary adjudication in its favor on the retaliation claim (Count II) of the complaint.

### 2.   Causal Connection

The defendant is entitled to summary judgment in its favor on the retaliation claim for a second reason.  Once a plaintiff has demonstrated that she engaged in a protected activity, she also has the obligation to show a causal connection by showing "that the decision makers were aware of the protected activity and the protected activity and the adverse action were not wholly unrelated."   Bass v. Board of County

---

[13]   Prior to the party, the issue of whether Infinity had engaged in some form of employment discrimination by holding a Christmas party had never been raised. Plaintiff simply was told to attend a party, and did so without protesting, although she apparently brought her own drink and did not eat anything or join in any of the party activities.  Such passive resistance to an activity that was never the subject of any complaint and that is not so patently offensive as the sexual harassment described in Crawford does not rise to the level of activity that would constitute "opposition."   It is reasonable to expect an employer, hearing an account of a supervisor pulling an employee's head to his crotch, to infer that the employee was opposing conduct that clearly violated the prohibition against sexual harassment.  It is not so reasonable to expect an employer, watching an employee stand idly by at a company party, to know that the employee is expressing opposition to discrimination on account of religion.

Comm'rs., Orange County, 256 F.3d 1095, 1119 (11th Cir. 2001) (overturned on other grounds).   The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated."   Brungart v. Bellsouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).).   However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that the protected activity caused the adverse employment action taken against her later.   Therefore, even if she had demonstrated that she engaged in a protected activity, Chandler fails to meet this third element of the *prima facie* case.

Even if her non-participation could be construed as a protected activity, she has failed to show that her actions at the party were causally connected to the discipline given to her or to her termination.   While the causal link is broadly construed to require plaintiff to prove little more than that the adverse action and the protected activity were not "wholly unrelated," it nevertheless is well settled that the plaintiff "must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action."   Goldsmith, 513 F.3d at 1278.   "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, we must focus on the

actual knowledge and actions of the decision-maker." Brown, 211 Fed. Appx. at 864, quoting Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1274 (11th Cir. 2002). The Eleventh Circuit Court of Appeals has further stated that "summary judgment cannot be avoided based on hunches unsupported with significant probative evidence." Raney v. Vinson Guard Service, Inc., 120 F.3d 1192, 1198 (11th Cir. 1997).

Other than Elder's knowledge of plaintiff's religion, there is no evidence that anyone at Infinity took any adverse employment actions against plaintiff after the November 2010 party. While it is true that plaintiff received several disciplinary notices afterward, there is no basis for inferring that she received them *because* of her religion. The Supreme Court has recently made the plaintiff's burden of proving retaliation even more difficult. In University of Texas Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013), the Court stated: "The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." 133 S. Ct. at 2534. Chandler has failed to show that she would not have been fired if she had not opposed Elder's alleged discrimination.[14] For this additional reason, Infinity's motion for summary judgment on the retaliation claim is due to be granted.

---

[14]     Because the court must view the facts in the light most favorable to the

### 3.   Pretext

Finally, even if plaintiff had met her burden of proving a *prima facie* case of retaliation, the presumption of retaliation may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.   Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason.   Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Because the employer has offered a nondiscriminatory reason for the termination --- that Chandler made too many errors to effectively function as an EFT clerk --- to overcome the motion for summary judgment Chandler must demonstrate by competent, admissible evidence that the defendant's nondiscriminatory reason is merely a pretext for retaliation against her.   She must show not only that the articulated reason is false, but also that the defendants' true reason for the discipline and/or termination was retaliation.   See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228

---

plaintiff, the court assumes, without deciding, that the ultimate decision to discipline and fire was Elder's, and not Crenshaw's.

(11th Cir. 1993).  It is not the duty of this court to evaluate whether the decision to terminate Chandler was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

No fact in evidence logically calls into question the credibility of the articulated nondiscriminatory reason.  To survive summary judgment, a plaintiff must show more than "mere curious timing coupled with speculative theories."  Raney v. Vinson Guard Serv. Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  The court's job is to consider whether the evidence submitted by the parties "presents a sufficient disagreement to require submission to a jury."  Combs, 106 F.3d at 1526.  The only evidence before this court indicates that the disciplinary notices and termination were made due to concerns separate from Chandler's refusal to participate at a Christmas party.  The evidence is undisputed that Chandler made the errors for which she was disciplined, including talking on the telephone at work for more than 14 hours during a month when she only worked 16 days.  Although she argues that other EFT clerks made errors and talked on the phone, the evidence demonstrates that no other clerk made as many errors or talked on the phone as frequently as did Chandler.[15]  Consequently, Chandler has failed to meet her

---

[15]     The court has determined that the complaint does not contain a claim that

secondary burden of showing that Infinity's stated reason for her termination was pretextual, and for this additional reason the claim of retaliation is subject to summary judgment in favor of the defendant.

Even if Chandler could support her claim that she engaged in a protected activity, and the protected activity was causally connected to her discipline and termination, Infinity has offered a legitimate, non-retaliatory reason for the disciplinary actions: that Chandler made several errors in her duties, and spent almost an hour a day during one month on the telephone for personal calls.   Once the defendant set forth the non-retaliatory reasons for the disciplines and termination, the plaintiff has the burden of demonstrating that the reason is pretext.

In this case, the plaintiff has produced no evidence of pretext.   Her disciplinary history extends back far before she even encountered Elder.   She was first placed on

---

the discipline she received was religious discrimination, but only that the discipline, including termination, was retaliatory.   Even if plaintiff had a claim that the disciplines were discriminatory, the claim would fail because she has not been able to identify a comparator --- another employee who committed essentially the same infractions and was treated less harshly.   Turner v. Florida Prepaid College Bd., 522 Fed. Appx. 829, 832 (11th Cir. 2013)(A plaintiff complaining of discriminatory discipline or termination generally must be able to identify a similarly situated employee, not within the protected class, who engaged in nearly identical conduct and was not disciplined or terminated.) Plaintiff does not provide any evidence that any other co-worker committed the same infractions and was punished less severely: she merely speculates as to what other employees did; and the employer has offered specific evidence that shows that the conduct was not "nearly identical."

probation in 2007 for excessive inefficiency, before she began working for Elder as an EFT clerk.   Her second probation was imposed in 2009, more than a year before the Christmas party, and she was "corrected" at least nine times between February and early June 2010.   She was issued an Informal Discipline in July 2010.   All of these disciplinary actions took place before she was "forced" to attend the party and before she "stood pat" by refusing to participate at the party.   All of the disciplinary actions taken before November 2010 occurred in the absence of any conduct she now claims was discriminatory.   After the party, she was given a written warning in January for her excessive phone use and was placed on probation.   Even though she committed another error while on probation --- a fire-able offense --- she was not terminated until June 2011, after she duplicated a debit to a customer's bank account.   Her termination came almost seven months after the party.

The Eleventh Circuit Court of Appeals has held that the timing of a termination has some bearing on whether it may be deemed causally related to the protected activity. See Farley v. Nationwide Mut. Ins. Co, 197 F.3d 1322, 1337 (11th Cir. 1999) (holding that plaintiff's termination seven weeks after filing EEOC discrimination charge established a causal connection); Berman v. Orkin Exterminating Co., Inc., 160 F.3d 697, 702 (11th Cir. 1998) (holding that adverse employment action taken between five weeks and "a couple of months" of plaintiff's filing of an EEOC complaint was

sufficient to establish a causal connection); <u>Donnellon v. Freuhauf Corp.</u>, 794 F.2d 598, 601 (11th Cir. 1986) (holding that one-month period between filing of discrimination complaint and adverse employment action was sufficient to show a causal connection). The court in <u>Higdon v. Jackson</u> defined further what constitutes sufficient temporal proximity to establish a causal connection in a retaliation case.

> We have held that a period as much as one month between the protected expression and the adverse action is not too protracted. <u>See Wideman</u>, 141 F.3d at 1457 (citing <u>Donnellon v. Fruehauf Corp.</u>, 794 F.2d 598, 601 (11th Cir. 1986)). The Supreme Court has stated that "mere temporal proximity between ... knowledge of protected activity and an adverse ... action ... must be 'very close.' " <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (citations omitted). The Court cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection. <u>See id</u>. (citing <u>Richmond v. ONEOK</u>, 120 F.3d 205, 209 (10th Cir.1997)(3-month period insufficient) and <u>Hughes v. Derwinski</u>, 967 F.2d 1168, 1174-75 (7th Cir.1992) (4-month period insufficient)). If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law. In <u>Wascura v. City of South Miami</u>, we held that "Wascura failed to present evidence from which a reasonable jury could find any causal connection between Wascura's notice to the Commissioners in January 1995 of her potential need to take time off to care for her son and her subsequent termination on May 16, 1995." 257 F.3d 1238, 1248 (11th Cir. 2001).

<u>Higdon v. Jackson</u>, 393 F.3d 1211, 1220 (11th Cir. 2004).

Based on the undisputed facts of this case, including the plaintiff's disciplinary history before the party, and the parameters established by the Eleventh Circuit Court of Appeals regarding temporal proximity, this court finds that the time between plaintiff's alleged protected activity and the adverse employment actions are not so close as to compel a conclusion that the two are related.  Accordingly, plaintiff has provided insufficient evidence of temporal proximity from which a jury could infer that the defendant's articulated reason for the termination is not worthy of credence and the real reason was retaliation.

Therefore, Chandler has not met the burden of establishing a *prima facie* case of retaliation with respect to her disciplinary actions or her termination, or to show that the non-retaliatory reason given for the termination is pretext.  Accordingly, the defendant's motion for summary judgment is due to be granted.


## CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented and the Eleventh Circuit Court of Appeals case law, and in light of Chandler's failure to establish a *prima facie* case of discrimination or retaliation, this court determines that Infinity's motion for summary judgment against Chandler is due to be GRANTED and both of her claims are due to be DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

DATED the 4th day of June, 2014.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE